## Butcher v. City of Philadelphia et al.

*McWilliams & Norberg*, for plaintiff.

*John P. Berry* and *Herman N. Schwartz*, assistant city solicitors, for defendants.

GORDON, JR., P. J., May 7, 1940—This is a bill in equity by a taxpayer to restrain the issuance by the City of Philadelphia of ten-year bonds to the amount of $1,500,000 in order to fund a like amount of outstanding judgment, or "mandamus", obligations arising out of capital expenditures by the city, which were incurred after it had exhausted its constitutional borrowing capacity. The facts are undisputed, and the case is before us on argument upon bill and answer.

Prior to the recent sale of future revenue of the gas works, the city had an accrued floating indebtedness of upwards of $39,000,000, included in which was an item of outstanding mandamuses for capital expenditures,

which, with interest, approximated six and a half million dollars, and to procure funds to extinguish this large floating indebtedness the city was about to make that sale. Its power to do so being questioned, the Supreme Court assumed original jurisdiction of the controversy in the case of Graham v. Philadelphia et al., 334 Pa. 513, 517, and upheld the validity of the proposed sale. In the course of its opinion, the court said, respecting the mandamus item of the floating debt:

"At the time of preparing its budget for 1939, the City owed approximately $39,000,000 as an accrued 'floating deficit,' of which $5,625,428 was for outstanding capital mandamuses with interest thereon. Of this sum about $5,000,000 represents capital charges well within the debt limit, created under valid authority, which may be refunded in City bonds, notwithstanding the limitation on the City's general borrowing capacity. (*Commonwealth ex rel. v. Cannon*, 308 Pa. 321). To retire its floating deficit, and balance the current budget, the city proposes to assign the rentals to be received by it from the gas works lease."

The $5,000,000 here referred to represented mandamuses issued on unsatisfied judgments for capital expenditures, which had been recovered against the city before 1933, when the constitutional limitation upon its borrowing capacity was reached. Following this suggestion of the Supreme Court, the city issued ten-year bonds to the amount of $5,000,000, and with the proceeds liquidated that part of the mandamus debt referred to. Thus by the sale of the gas works revenues and the issuance of the bonds, it extinguished all of its then outstanding floating debt, except $1,500,000. This was in the form of mandamuses issued upon judgments for capital expenditures recovered against the city after the exhaustion of its borrowing capacity in 1935 and before December 1, 1938, and the city now proposes to refund that balance by the sale of the bonds in question, which will mature in ten years.

Complainant contends that the city is without power to issue bonds for this purpose, because it would thereby be increasing its debt beyond the 10 percent limit on its borrowing capacity fixed by article IX, sec. 8, of the Constitution. The city, on the other hand, contends that by thus transforming a mandamus debt bearing six percent interest into a bonded obligation bearing three percent or less, a substantial saving in its interest expenditures would be brought about, and that the issuance of the bonds to pay off the existing mandamuses would not work an increase in the public debt, because it would amount to a mere refunding of an already existing debt, and hence would not violate the constitutional provision in question.

Considered alone from the standpoint of the Constitution, there is considerable force in the city's contention that such an operation would not increase the municipal debt. Judgment debts are as much a part of the valid indebtedness of a municipality as its bonded obligations, or any other form of indebtedness. Indeed, once they have ripened into final and irreversible judgments, they are less subject to question, and therefore more secure, than its bonds. In Plains Township's Appeal, 21 Pa. Superior Ct. 68, 206 Pa. 556, the court, discussing the judgment debts of the township in that case, said (p. 71) :

"The several actions were brought against the township to recover an indebtedness alleged to be due; whether the township was legally indebted necessarily involved the question of the validity of the plaintiff's claim under the constitution and laws of the commonwealth; the judgment in favor of the plaintiff was an adjudication that the sum was legally due and owing. 'A debt due on a judgment cannot be said, in legal phraseology, to be a debt arising on a contract; it is a sum of money due by the decree of a court or magistrate:' . . . The power of the township to contract the obligation was legally cognizable in each one of the proceedings which resulted in a judgment against it, and the entry of the judgment was, so

far as that demand was concerned, a judicial determination of the question. The judgment until reversed is conclusive of the right of the plaintiff to recover and the obligation of the township to pay." So also Gilboy v. Duryea Borough, 228 Pa. 252; Cromwell v. County of Sac, 94 U. S. 351.

In Board of Commissioners of Lake County v. Platt, 79 Fed. 567, an individual had performed services for Lake County, and had obtained a judgment against the county which had been funded by the issuance of bonds. The county refused to pay interest on the bonds, and, when action was brought by their holder, the county attempted to defend on the grounds that it did not owe anything to the judgment creditor, and that the bonds issued to pay the judgment were void, because they created an indebtedness in excess of the constitutional limit. In overruling this contention, the court, after discussing the conclusive nature of a judgment obligation, thus clearly and forcefully points out the legal effect of a judgment on bonds issued to satisfy it (p. 572): "If, therefore, Parks [plaintiff in the judgment] or his assignees had sued the plaintiff in error upon his judgment, or upon the debt which it evidenced, that judgment would have conclusively estopped the plaintiff in error from making the defense that its indebtedness was in excess of the constitutional limitation. But this action is upon a part of the same debt represented by that judgment. The bonds and coupons issued in satisfaction of the judgment evidence the same indebtedness that the judgment represented, and the holder of each bond and of each coupon is, in legal effect, an assignee of the debt pro tanto. Thus the defendant in error is in privity with Parks, and is entitled to invoke every presumption and every estoppel in support of his claim which Parks could have called to his aid if he had brought this action upon his judgment. . . . Our conclusion is that in an action to enforce the collection of a judgment or the collection of bonds or coupons issued in payment of a judgment against a municipal or quasi

municipal corporation, the judgment conclusively estops the corporation from making the defense that the original indebtedness evidenced by it was in excess of the amount which the corporation had the power to create, under the limitations of the constitution of the state in which it was incorporated."

The funding of a judgment by a bond issue, therefore, will not in itself increase the existing indebtedness of a city. The transaction is a mere substitution of the bonded obligation for the judgment debt, through the extinguishment of the judgment with the proceeds of the sale of the bonds.

Enough has been said to indicate the soundness of the city's position that the bond issue in question would not increase its debt beyond the constitutional limit. There is another objection to the proposed funding operation, however, which arises out of legislative enactment, and which, in our opinion, is fatal to it. In recommending the funding of the outstanding mandamuses the Supreme Court, in Graham v. Philadelphia et al., supra, was careful to distinguish between the $5,000,000 which represented judgments obtained before the city had exhausted its borrowing capacity and the remaining $1,500,000 which were obtained at a later date. As to the former, the court indicated in its opinion that the city had ample authority to liquidate them with borrowed money. That they were issued after the debt limit had been reached and resulted in continuing a presently due obligation in excess of the city's borrowing capacity is now beside the point, for the issuance of the bonds for that purpose under the sanction of the Supreme Court's suggestion precludes all question of their validity. The remaining judgment debts, however, stand in an entirely different position, and the fact that the Supreme Court recommended the funding of the earlier judgments strongly suggests the conclusion that it considered those recovered after 1933 to be unfundable; and this distinction points the way to the answer to the question before us.

Apart from the use of the proceeds of a sale of capital assets, a municipality has only two sources from which it can derive funds to discharge its obligations, namely, borrowed money and current revenues, including taxation, and except where it is restrained by constitutional or legislative prohibition it has full discretion in the employment of either source. It may pay all its debts as they accrue out of current revenues, if they are sufficient for the purpose, or, while its credit lasts, finance itself entirely through borrowed money. Of course, the principles of sound municipal financing, which require a city to meet its current expenditures out of current revenues, and to confine the use of borrowings to capital investments and those municipal activities the benefits of which are spread over long periods and enjoyed by later generations, would prohibit the latter course. Therefore, in order to insure reasonably prudent financing, and to prevent reckless and extravagant borrowing, municipalities are drastically restricted in their financial programs by constitutional limitations upon their borrowing power, and statutory regulations of their budgetary methods. The City Charter Act of June 25, 1919, P. L. 581, carefully regulates the use by the city of its various sources of revenue, and, in its directions for framing the municipal budget, clearly limits the extent to which borrowed money may be employed in the city's financing. Section 1 of article XVII of that act requires the mayor, on or before October 15th of each year, to furnish to the council a statement of the estimated receipts, "other than from taxation, including money proposed to be borrowed and liabilities of every kind for the ensuing calendar year and the estimated expenditures . . . designating which of such liabilities and expenditures should be met from current receipts and which should be met from loan funds."

Section 2 requires the council, by the fifteenth of the following December, to adopt a financial program, showing the estimated receipts, liabilities, and expenditures of

the city, and provides that "council shall . . . have full discretion to determine the character and amount of expenditures to be made out of the estimated receipts of the city during the ensuing year." We cannot agree with the contention of the learned city solicitor that the duty placed upon the mayor in the first section to designate which of the liabilities and expenditures should be met from current receipts and which from loan funds, together with the conferring upon council, in the second section, of "full discretion" to determine the amount and character of the city's expenditures, gives them authority to adopt a financial program calling for the floating of loans in circumstances or for purposes prohibited by law. The act of the mayor in designating the source from which particular expenditures are to be made is merely advisory to the council, and the discretion vested in the council to adopt the program is subject to the limitations placed by law upon municipal financing. It does not follow, as appears to be contended by the city solicitor, from the conferring of "full discretion" on council to determine the amount and character of expenditures out of estimated receipts, that the ordinance of February 13, 1940, which authorizes the bond issue, is a valid exercise of that discretion. To reach such a conclusion would necessitate our holding that the legislature intended to nullify all the existing and salutary legal regulations designed to guard against financial imprudence, and thereby to expose the city to unrestrained official recklessness and prodigality in municipal spending. The discretion given is full and absolute within its scope, but it is circumscribed by the regulations and limitations prescribed by law for its exercise, and a borrowing for a forbidden purpose, or at a prohibitive time, would be a clear abuse of the power and discretion conferred.

After adopting its financial program for the ensuing year showing the city's estimated receipts from all sources other than taxation, section 3, art. XVII, of the Charter Act, supra, provides that the council shall then levy a tax

rate "which, together with the estimated receipts from all other sources except borrowed money, shall yield sufficient receipts to meet the liabilities of the city of every kind (except liabilities to be paid out of loan funds) for the ensuing year and the current expenditures, not including expenditures from loan funds, as fixed and determined by the council. . . ." Thus having before it its financial program and its receipts from all sources, including taxation, section 4, art. XVII, provides that:

"The council may, from time to time, make appropriations out of such estimated receipts of the city for the ensuing year to meet the requirements of such . . . agencies, as determined by the council but [sc. and] *from the receipts of the city from taxation and sources, other than loan funds, estimated as provided in this article, the council shall appropriate, before the beginning of the ensuing year, a sufficient amount for the extinguishment of the floating indebtedness (other than that accruing within one year from condemnation of real property) which the city controller may estimate to be outstanding upon the first of January following,* for the payment of all lawful obligations due by the city during the fiscal year commencing January first, and for such expenditures to be met from such receipts as may be authorized by the council". It is evident from these provisions of the City Charter that it is the intention of the legislature to require the city to meet all its expenditures during the following year out of current revenues, except such as are lawfully payable out of loan funds; and that the "extinguishment of the floating debt of the city" is an expenditure expressly directed to be made from "receipts from taxation and sources *other* than loan funds." This language admits of no other interpretation, at least when the city's borrowing capacity is exhausted, and it is immaterial whether the floating debt arises out of current or capital expenditures. This is especially so in view of the so-called "pay-as-you-go" provisions of the City Charter, which forbid the making of any contract without previous appropria-

tion. Debts which arise by operation of law and without previous appropriation, as for instance liabilities arising out of tort or the exercise of the power of eminent domain, must be met out of the current revenues of the succeeding year.

We do not mean to imply that a city which has sufficient borrowing power could not discharge a debt involving either a capital or current expenditure with borrowed money. But, when its borrowing power is exhausted, the law will not permit it to incur an obligation without a previous appropriation, and then, merely because the obligation has been incurred, to discharge it by further borrowing. To so hold would open the door to the very evils in municipal financing which the restrictions imposed by the Constitution and the City Charter are designed to prevent.

Put in its baldest form the city's argument is equivalent to saying, in effect: "We did not have the funds available in current revenue to make these very desirable capital expenditures involving $1,500,000, and could not lawfully borrow the money before spending it; we therefore spent it without having it; let us now borrow to pay off the debt incurred in the spending."

The fallacy in such a contention is manifest, and to permit it to prevail would be to flagrantly ignore both the letter and the spirit of the law. The constitutional debt limit having been reached, the door is closed to borrowing as a source of revenue. No other source remains but current revenues, and from them the legislature requires the funds to be secured for the extinguishment of this floating indebtedness.

That this is the legislative intent is confirmed by the provisions of the Act of June 21, 1939, P. L. 617, which was in force when the ordinance authorizing the proposed loan was passed by council, and which read as follows:

"Section 1. As used in this act, the word 'deficits' shall mean all unfunded obligations of the city and county of

Philadelphia remaining unpaid as of the thirty-first day of December, one thousand nine hundred and thirty-eight; other indebtedness payable out of the current funds, including indebtedness evidenced by outstanding writs of mandamus execution; but not including obligations due the sinking fund commission.

"Section 2. Cities of the first class be, and they are hereby authorized and directed to pay the amount of deficits, as hereinabove defined, which have arisen, and which may arise, on or before the thirty-first day of December, one thousand nine hundred and thirty-eight, in equal, annual installments, during the year one thousand nine hundred and thirty-nine and succeeding years; and to provide, by appropriation, for the payment thereof during the said years. The council of said cities, in levying and fixing the tax rate, and in making appropriations, and in framing and formulating their annual financial programs or budgets, during the said years, shall not be required to provide for or include therein the amount of such deficits, as hereinabove defined, except as to two million five hundred thousand dollars ($2,500,000) for each year; and the city controller, in furnishing data for the preparation of the financial programs or budgets for said years, as required by law, shall take into account as a current liability of said cities by reason of such deficits to be discharged during each of said years, only the said two million five hundred thousand dollars ($2,500,000) . . . Provided, however, That all indebtedness, arising from writs of mandamus executions, incurred in accordance with law during the year one thousand nine hundred and thirty-nine or any subsequent year and not paid during such year, shall be included and certified as a current liability by the city controller in furnishing data for the preparation of the financial programs or budgets for the next succeeding year, and shall be provided for in the budget and tax levy for such next succeeding year."

This act, passed before the decision of the Supreme Court in Graham v. Philadelphia et al., supra, when the

floating debt was $39,000,000, was designed to help the city, by authorizing the gradual liquidation over a period of about 15 years of an accumulated debt that was so large that, as a practical matter, it could not be immediately raised out of current revenues. While its constitutionality may be open to question, it is not challenged by complainant on that ground, and we do not consider ourselves obliged to question its validity of our own motion. The rule which presumes the constitutionality of legislation and discourages the practice of invalidating acts by judicial decision, unless their constitutionality is challenged by the litigant, justifies us in declining to raise the question ourselves. Assuming its validity, therefore, it will be noticed that the act expressly requires the mandamus debts of the city, both past and future, to be paid out of current revenues. Those arising before December 31, 1938, may be deferred in the manner authorized by the act, while those arising after that date must be paid during the current year or out of the revenues of the succeeding year.

This act, therefore, definitely negatives the right of the city to pay off the mandamuses in question out of borrowed money. In our opinion, however, it affords some measure of relief to the city's embarrassment. When the floating debt was liquidated out of the proceeds of the sale of the revenue of the gas works there remained only the $6,500,000 in mandamus debts. Under the Act of 1939, the city had the right to pay off these at the rate of $2,500,-000 a year. This would have postponed the payment of the present mandamuses for three years, and we see no legal obstacle under the act to the city taking advantage of the permission thus given and issuing bonds for the temporary funding of those debts payable three years hence. If provision is made for their redemption out of current revenues, within that period, the issuance of such temporary bonds would be a mere refunding operation unobjectionable as an increase of the city's debt. The desirability of doing so, as to which we express no opinion,

rests entirely in the judgment of the municipal authorities.

For the foregoing reasons we are of opinion that on the allegations of the bill and answer complainant is entitled to the relief which he seeks, and a decree will be entered restraining the city from selling or offering for sale any bonds or other evidence of indebtedness for the purpose of extinguishing the $1,500,000 in judgment debts which are the basis of this suit, or from otherwise borrowing money or pledging its credit so long as its constitutional borrowing power is exhausted, except that it may, for a temporary period not exceeding three years, issue bonds or otherwise pledge its credit for said purpose; such borrowing to be repayable out of the current revenues of said period. Counsel will prepare and submit for entry by the court a form of final decree in accordance with this opinion.